**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GARRETT SCHMOELLER,

      Plaintiff,

    v.

VILLAGE OF ISLAND LAKE, et al.,

      Defendants.

No. 15 CV 10617

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Garrett Schmoeller was a police officer in the Village of Island Lake. Schmoeller attained the rank of sergeant before he was demoted due to procedural defects in the promotion. Schmoeller was given the chance to try again, but the Village's Board of Fire and Police Commissioners passed Schmoeller over, choosing to promote another officer instead. Schmoeller contends that the promotion denial was based on his political associations. The officer who received the promotion had supported the winning candidate in the recent mayoral election, but Schmoeller did not. Schmoeller filed suit, alleging a violation of his First Amendment rights. About a year after he filed suit, the Village terminated Schmoeller's employment. In his amended complaint, Schmoeller brings claims of First Amendment violations and tortious interference with prospective economic advantage against the Village, the mayor, the commissioners, and two of his supervisors at the police department. Defendants move for summary judgment. For the reasons stated below, the motion is granted.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To survive summary judgment, the nonmoving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 591 (7th Cir. 2016) (citation omitted). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018).

## II.    Facts

Plaintiff Garrett Schmoeller became a full-time police officer at the Village of Island Lake Police Department in 2004. [68] ¶ 2.[1] At the time, Charles Amrich was the Village's mayor, but Amrich was replaced the following year after losing the election to Debbie Herrmann. [68] ¶¶ 3, 24. Over the next several years, Schmoeller

---

[1] Bracketed numbers refer to docket numbers on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings, except in the case of citations to deposition transcripts, which use the transcript's original page number. Facts are largely taken from defendants' Local Rule 56.1 statement of undisputed material facts, [68]; Schmoeller's response, [75]; Schmoeller's statement of facts, [76]; and defendants' response, [102].

received some reprimands, mostly for repeated attendance issues. [68] ¶¶ 5–6, 9. Then, in 2011, Schmoeller was promoted to "probationary sergeant." [68] ¶ 13. But it did not last.

In 2013, Amrich defeated Herrmann to take back the mayoral seat. [68] ¶ 24. Amrich made some personnel changes, including changes to the Village's Board of Fire and Police Commissioners. The Board is responsible for hiring and promoting police officers and for terminating probationary officers. [68] ¶ 32. The commissioners at the relevant times for this lawsuit were Arnold Epstein, Debra Jenkins, and Tom Martin. [68] ¶ 29. Each of the commissioners had in some way supported Amrich in his mayoral campaign. [68] ¶¶ 21–22; [102] ¶ 11. In 2014, the commissioners discovered that some of the previous administration's sergeant promotions, including Schmoeller's, were invalid due to procedural errors. [68] ¶¶ 33, 35. So Schmoeller was informed of the news and given the opportunity to re-take the sergeants' test to qualify for the promotion under the proper procedures. [68] ¶ 36.

At the same time, Bill Dickerson was vying for promotion to sergeant. Dickerson had recently re-joined the police department after being fired during his probationary period in 2010. [68] ¶ 61. Dickerson's termination was based on allegations that included insubordination and taking "breaks" at his house while on duty. [102] ¶ 5. In the year following his termination from the Village, Dickerson pleaded guilty to a disorderly conduct charge for an altercation with his then girlfriend and had orders of protection issued against him on behalf of his ex-

girlfriend and ex-wife. [102] ¶ 6. Dickerson supported Amrich's bid for mayor in 2013 by putting up campaign signs, writing blog articles, canvassing, and donating $20. [102] ¶ 7. After the election, the Village's board of trustees voted on whether to reinstate Dickerson to the police force. [68] ¶ 62. The vote resulted in a tie, so Amrich cast the tie-breaking vote in favor of reinstating Dickerson. [68] ¶ 63.

Schmoeller, Dickerson, and others took the sergeants' test in 2014, [68] ¶ 38, though there were a few wrinkles. Dickerson was given an older version of the test—the version that was in place in 2012—in an effort to correct for Dickerson's earlier termination, which the commissioners believed was done illegally and contrary to proper procedure. [102] ¶ 22. In contrast, Schmoeller and others got a new version of the test. [102] ¶ 23. Dickerson also had a few months' more notice of the test to prepare. [102] ¶ 23. Schmoeller did not hear about the date of the oral component of the exam until another candidate told him. [102] ¶ 28. After receiving the results of the test, the commissioners noticed that the test included a 75-question section that not all of the candidates realized would be on the test. [68] ¶ 40. To compensate, the commissioners omitted that section from all of the candidates' scores. [68] ¶ 40. The test scores were combined with any applicable bonus points for military service as well as "chief points" (discretionary points awarded by the chief of police) to compile a ranking of the candidates. [68] ¶ 41. The commissioners were legally obligated to choose from among the top three candidates on the list—those candidates were Officer Deuter, Schmoeller, and Dickerson, in that order. [68] ¶¶ 41, 44.

The commissioners first selected Deuter (who, like Schmoeller, had previously been improperly selected for promotion under the previous administration). [68] ¶ 45. Then the choice for the second available sergeant position came down to Schmoeller or Dickerson. The commissioners chose not to consider chief points, preferring instead to focus on the candidates' test scores. [68] ¶¶ 47–48. Dickerson scored higher than Schmoeller on the test. [68] ¶ 47. Commissioner Jenkins also told the other commissioners that she had negative experiences with Schmoeller in the past and felt as though he had stalked her. [68] ¶ 49. The commissioners did not discuss any of the candidates' political associations. [68] ¶ 50. The commissioners unanimously decided to select Dickerson instead of Schmoeller, and the appointment was approved. [68] ¶ 45.

Schmoeller filed this lawsuit in November 2015. [1]. In March 2016, Schmoeller wrote a memo to Chief Anthony Sciarrone, who Amrich had appointed just about a year earlier, to say that he had been reassigned to a patrol vehicle he believed was unsafe and that he felt as though the reassignment was retaliation for his lawsuit. [68] ¶ 30; [102] ¶ 39. Dickerson, now a sergeant, responded on behalf of Sciarrone, stating, among other things, that future unfounded accusations of retaliation could be viewed as insubordination. [102] ¶ 39. In September 2016, Schmoeller was reprimanded for telling an inappropriate joke back in March of that year, and Schmoeller received a negative performance review from Dickerson (and signed by Sciarrone), which was abnormal because Dickerson had never evaluated anyone else. [102] ¶¶ 36, 38, 40.

Also in September 2016, a video surfaced on Facebook of an arrest Schmoeller had assisted with several months before. [68] ¶ 70. The arresting officer, Gale Holford, had told a citizen to leave a bar, and, as the citizen was walking away while filming Holford, decided to arrest him. [68-1] at 254:12–258:18; [98]. Schmoeller appeared after the arrest was already underway, to provide assistance. [68-9] at 27:6–22; [98]. The video does not provide much visual depiction of the arrest itself, but Schmoeller's voice can be heard saying, "I'm gonna show you pain," in response to the arrestee's expression of discomfort. [98]; *see also* [68-12] at 25. The police department investigated the allegations of misconduct, and Dickerson played a role in the investigation. [102] ¶ 48. Ultimately, Sciarrone submitted recommendations to Amrich that both Holford and Schmoeller be fired. [68] ¶¶ 74, 76. Amrich rejected Sciarrone's recommendation as to Holford, choosing to suspend him instead, but accepted Sciarrone's recommendation to terminate Schmoeller. [68] ¶¶ 77, 80. Schmoeller was terminated in November 2016. [68] ¶ 80.

## III. Analysis

### A. First Amendment Claims

Schmoeller alleges that defendants discriminated against him in violation of his First Amendment[2] rights by (1) denying him promotion based on his political

---

[2] The complaint also refers to the Fourteenth Amendment. In the context of Schmoeller's complaint, "[t]he reference to the Fourteenth Amendment is understood to be a reference to the application of the First Amendment to the states by way of the Fourteenth Amendment." [26] at 6. Although the complaint bases the retaliation claim on Schmoeller's "right to access to the courts, to petition the government, and his free speech rights," [46] ¶ 60, "[r]etaliation for filing a lawsuit is prohibited by the First Amendment's protection of free speech, not some concept of an independent right of access to courts." *Zorzi v. Cty. of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994).

affiliation and (2) terminating his employment as retaliation for filing this lawsuit. To establish a prima facie case, Schmoeller must show that "(1) [his] speech was constitutionally protected; (2) [he] suffered a deprivation likely to deter free speech; and (3) [his] speech was at least a motivating factor in the employer's actions." *Yahnke v. Kane Cty., Illinois*, 823 F.3d 1066, 1070 (7th Cir. 2016). If Schmoeller establishes that his speech was a motivating factor in defendants' actions, the burden shifts to defendants "to show that [they] would have taken the same action even in the absence of the protected conduct." *Id.* at 1071. The burden then shifts back to Schmoeller to show that defendants' proffered reasons were pretextual. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 670 (7th Cir. 2009). Pretext is established by evidence that the protected activity was "most likely" the reason for the adverse action, "the defendants' justifications have no basis in fact," "the justifications were not the real reason for firing him," or "the justifications were insufficient to warrant the [adverse action]." *Vukadinovich v. Bd. of Sch. Trustees of N. Newton Sch. Corp.*, 278 F.3d 693, 699–700 (7th Cir. 2002). Defendants concede the first two prima facie elements for both Schmoeller's promotion and termination claims, narrowing the scope of their motion to whether Schmoeller's speech was a "motivating factor" in the promotion or termination.

A "motivating factor" can also be described as a "sufficient condition," but it is not a "necessary condition." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). That is to say, Schmoeller does not need to establish that his protected speech was the only factor that caused his employer's actions (or that his speech

was the but-for cause of the action) in order to meet his prima facie burden, but he does have to establish that his speech was at least one motivating factor. *See Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008). He can meet this burden through direct or circumstantial evidence. *Id.* Some examples of evidence that may establish the motivating-factor element are (1) suspicious timing, (2) ambiguous statements, (3) treatment of other employees in the same protected group, (4) a pattern of political patronage, (5) testimony from someone other than plaintiff that defendants wanted to get rid of a political opponent, and (6) evidence that the justifications for the adverse action were pretextual. *See Kidwell*, 679 F.3d at 966; *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 495 (7th Cir. 2002). *Cf. Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 862 (7th Cir. 2015). But "suspicion is not enough to get past a motion for summary judgment." *Kidwell*, 679 F.3d at 966 (citation omitted).

### 1.    *Promotion*

Schmoeller claims that the commissioners (Jenkins, Martin, and Epstein) denied his promotion to sergeant based on his political associations. More specifically, Schmoeller says the commissioners promoted Dickerson to sergeant instead of him because Dickerson backed Amrich in the mayoral election and Schmoeller did not. The threshold question is whether the commissioners even knew about Schmoeller's or Dickerson's political activities. *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004). All of the commissioners testified that they did not know about Schmoeller's political associations (or those of Deuter, the other promoted officer). [68] ¶ 51. Epstein and Jenkins, but not Martin, knew that Dickerson

8

supported Amrich. [68] ¶ 51. Schmoeller argues that "this necessarily means that, to [the commissioners'] knowledge, Dickerson was clearly more politically supportive than Plaintiff." [74] at 7. But in order to weigh the relative political activity of Schmoeller and Dickerson, the commissioners would have had to know something about Schmoeller's political activities. There is no evidence that they did. At the motion to dismiss stage, I noted that since only about 800 people voted in the mayoral election, it may be reasonable to infer that politically active people were aware of each other's existence. [26] at 8 n.5. Schmoeller does not rely on this point and at the summary judgment stage, he must come forward with some evidence to support the inference he seeks. Schmoeller does have evidence that Dickerson received favorable treatment in test preparation. That evidence is not tied to Dickerson's political affiliation relative to Schmoeller's, and so does not contribute to any showing that the commissioners knew about Schmoeller's political activity (or lack thereof). Without any evidence of knowledge of Schmoeller's political affiliation, a jury could not conclude that the commissioners were politically motivated to deny him a promotion.

But even if a jury could infer that the commissioners knew that Dickerson was politically aligned with Amrich while Schmoeller was not, Schmoeller still does not have evidence to support an inference of political motivation. Schmoeller argues that he was much more qualified than Dickerson for the promotion. His argument that Dickerson was unqualified rests on Dickerson's domestic-related disorderly conduct conviction, previous termination as a probationary officer, and suspension

at a different police department for insubordination. [74] at 7–8. Evidence of superior qualifications of the unsuccessful applicant is not, by itself, evidence of discriminatory motive, but it can be a plus factor in a plaintiff's circumstantial case. *See Hall*, 389 F.3d at 763–64. That makes sense, however, only if the defendants actually knew that the unsuccessful applicant was more qualified (or were aware of the information that suggests one applicant was more qualified than the other), because that knowledge sheds light on their motivations. Here, the majority of the commissioners did not know about Dickerson's disorderly conduct conviction when they made the promotion decision, *see* [68-6] at 23:13–24:17; [68-7] at 12:18–13:3, or why Dickerson had been fired during his probationary period (other than what they understood to be political reasons unrelated to Dickerson's performance), *see* [68-6] at 20:8–21:9; [68-7] at 23:7–24; [68-8] at 39:6–22, and there is no evidence that any of the commissioners knew that a different police department had once suspended Dickerson's police powers for insubordination. But the commissioners all had information about Schmoeller's disciplinary history, they knew Dickerson scored better on the test, and they were aware that Commissioner Jenkins claimed that Schmoeller stalked her. A jury could not find that the commissioners, based on the information they had in front of them, were promoting a less qualified applicant.[3]

---

[3] Schmoeller cites to allegations about Amrich's actions to support his claim that the promotion was politically motivated, including the mayor's pattern of political patronage, that Amrich voted to reinstate Dickerson after he was fired, and that the commissioners involved in invalidating Schmoeller's promotion were involved in the Amrich campaign (suggesting, then, that the commissioners were Amrich's political flunkies). [74] at 8–9. But Schmoeller's promotion claim is against the commissioners, [46] ¶¶ 22, 38, 40, and the evidence shows that the commissioners made their decision without input from Amrich. [68] ¶ 52. There is no evidence that the commissioners engaged in political patronage when

Finally, Schmoeller contends that the commissioners' reasons for not promoting him were pretextual. The commissioners say that they decided who they would promote based on the sergeants' test scores and Jenkins's prior negative experiences with Schmoeller. It is undisputed that Dickerson scored better on the test than Schmoeller did. [68] ¶ 47. Schmoeller points to what he views as favoritism toward Dickerson during the testing process—for example, Dickerson had more information about the sergeants' test than Schmoeller and Dickerson had more time to prepare for it—but "although these may suggest deficiencies in the selection process, they do not suggest that the defendants made the hiring decision on the basis of politics." *Hall*, 389 F.3d at 764. This is also true of any inaccuracies in the officers' disciplinary histories that were provided to the commissioners, particularly where there is no indication that it was the commissioners' responsibility to make sure the officers' files were accurate, and the commissioners' decision to disregard chief points (which would have boosted Schmoeller's ranking) because they thought they were biased.

Nor is it disputed that Jenkins told the commissioners she felt Schmoeller had stalked her. [68] ¶ 49; [75] ¶ 49. Schmoeller dismisses Jenkins's comments as lies, but even if Jenkins were deliberately lying about having been stalked and harassed by Schmoeller, it would not make a difference because the three-person

---

making police personnel decisions. Even if Amrich harbored politically motivated preferences for sergeant promotions, there is no evidence from which a jury could conclude that the commissioners knew that. So Amrich's actions carry no weight in determining the motivation behind the commissioners' promotion decision. The record suggests that the commissioners' recommendation is approved by the mayor and board of trustees, *see* [68-4] at 88:17–89:2, but Schmoeller has not argued that Amrich was the politically motivated decision-maker that caused the denial of the promotion, so he has waived the argument.

board voted unanimously to promote Dickerson instead of Schmoeller and there is no indication that Epstein or Martin knew that Jenkins was lying. *Cf. Hall*, 389 F.3d at 763 (focusing on what the majority of the commissioners knew). If Epstein and Martin voted against Schmoeller's promotion because they believed Jenkins, then the denial of Schmoeller's promotion was not based on constitutionally-impermissible grounds, whether Jenkins was lying or not. The same is true of Schmoeller's allegations that Jenkins deliberately withheld pertinent information about Dickerson's disciplinary past. Schmoeller has not established that the commissioners' reasons for not promoting him were pretextual.

Defendants' motion for summary judgment on Count I is granted.

### 2. *Termination*

Schmoeller alleges that his employment was terminated in retaliation for filing this lawsuit, asserting the claim against Amrich, Sciarrone, and Dickerson. To establish retaliatory motive for the termination, Schmoeller points to the timing of events. Schmoeller suggests that the termination was triggered by the noticing of defendants' depositions in September 2016. But the protected activity here, as alleged by Schmoeller and litigated by the parties, is the filing of the lawsuit, not the noticing of depositions.[4] Schmoeller initiated this lawsuit in December 2015, [1], and he was not terminated until November 2016. [68] ¶ 80. Suspicious timing on its

---

[4] "To receive First Amendment protection, [ ] a public employee must speak 'as a citizen on a matter of public concern.'" *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 377 (7th Cir. 2009) (citation omitted). Defendants concede that filing his lawsuit is a protected activity. But I note that Schmoeller's post-complaint litigation activity, like noticing a deposition in a lawsuit over his then-existing employment relationship, is not a matter of public concern.

own is rarely enough to raise an inference of causation, and when it does, the Seventh Circuit "typically allow[s] no more than a few days to elapse between the protected activity and the adverse action." *Kidwell*, 679 F.3d at 966; *Shaw v. Litscher*, 715 Fed.App'x 521, 523 (7th Cir. 2017) ("[W]e've held in other cases that a time lag of seven months is too long to permit a reasonable inference of retaliation."). So the timing of Schmoeller's termination is not suspicious.

Schmoeller cites a few events that occurred between his filing the lawsuit and the termination—a letter in which Dickerson told Schmoeller that unfounded accusations of retaliation would be considered insubordination; a negative performance review; and a reprimand he received for making an offensive joke. None of these events tie Schmoeller's termination to his lawsuit. The letter from Dickerson was in response to Schmoeller's memorandum complaining about being asked to change patrol cars and suggesting that the car change was ordered as retaliation for his lawsuit. Dickerson's response did not itself constitute retaliation—if anything, it was a denial of retaliation. The letter does include this statement: "Let this serve as a warning that further unfounded accusations such as this against the command staff could be construed as insubordination and actions detrimental to the department." [68-1] at 224. But Dickerson's "warning" does not connect any dots between Schmoeller's termination and his lawsuit—Schmoeller's argument is not that he was terminated because he complained of retaliation again in defiance of Dickerson's warning. Similarly, the negative performance evaluation and reprimand for the offensive joke (which Schmoeller does not remember whether

he made) do not raise a reasonable inference that Schmoeller's termination was because he filed the lawsuit. Filing a lawsuit does not insulate a public employee from reprimand unrelated to the lawsuit. *See Kidwell*, 679 F.3d at 967 ("[A]n employee's complaint . . . does not immunize [him] from being subsequently disciplined or terminated for inappropriate workplace behavior." (citation omitted)).

Defendants say the true reason behind Schmoeller's termination was that Schmoeller "used excessive force in an arrest of a civilian" and that "Sciarrone determined that [Schmoeller], unlike the other officers on the Village of Island Lake Police force, was the only officer, to date, under [ ] Sciarrone's command that was found to have used excessive and unnecessary force on an arrestee already in handcuffs." [69] at 12–13. Schmoeller contends that these statements are false. He could be right—viewing the facts in the light most favorable to Schmoeller, his conduct toward the arrestee may have been reasonable. But the question is whether Amrich's stated reason, not Sciarrone's, was pretextual. Amrich was the ultimate decision-maker, as demonstrated by the fact that although Sciarrone recommended both Holford and Schmoeller be fired, Amrich only approved Schmoeller's termination.[5] The record does not show that Amrich relied on Sciarrone's stated justification for the termination, but rather demonstrates that Amrich's stated reason was Schmoeller's inappropriate comments during the arrest—which Amrich

---

[5] Schmoeller has not invoked a cat's paw theory to impute Sciarrone's or Dickerson's alleged retaliatory motives to Amrich. Even if he had, he would have been unsuccessful, because there is no evidence "to show a causal link between the presumed unlawful animus of someone like [Sciarrone or Dickerson], who did not make the decision, and the decision itself." *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 929 (7th Cir. 2017).

recalled as "I'll show you what hurt is or something to that effect"—and the fact that Anderson was "obviously in pain." [68-4] at 31.[6]  There is no evidence to suggest that these were not the true reasons Amrich decided to terminate Schmoeller. *See Zerante v. DeLuca*, 555 F.3d 582, 586 (7th Cir. 2009) ("A city employee may be fired for a good reason or for no reason at all, as long as she was not fired because of her constitutionally protected activities.").[7]

That Holford was not terminated does not establish that Amrich's justifications for Schmoeller's termination were pretextual. Holford did not make the same comments that Schmoeller did, and Amrich explained that he chose not to terminate Holford because Holford had "been an exemplary officer up to that point." [68-4] at 120:2–11. Though there is evidence to show that Holford in fact did not have a clean disciplinary history, *see* [102] ¶ 50, there is no evidence to say that Amrich did not genuinely believe in Holford's clean past.[8]  Holford testified that

---

[6] The arrestee had a history of complaints against officers, which Schmoeller argues should have discredited his statements. But there is no evidence to suggest that Amrich knew that the arrestee was faking his pain, even if some may have had doubts. *See* [68-4] at 118:9–18 (Amrich's testimony that the thought had occurred to him that the arrestee could have been "playing to the audience" but he did not know whether the arrestee was faking his pain).

[7] One might infer that Amrich was not inclined to favor Schmoeller, perhaps because Schmoeller was not a political supporter. But Schmoeller's retaliation claim alleges that he was fired because he filed a lawsuit, not because he was a generally disfavored employee. Amrich's attitude toward Schmoeller may have caused the mayor to give more weight to the arrestee's version of events, but it does not suggest that Amrich's stated reason was false.

[8] Schmoeller makes a number of arguments about the findings of the investigation, suggesting that defendants knew some of those findings—like that Schmoeller was untruthful during the investigation—were false, but none of those arguments contradict Amrich's reasons for terminating Schmoeller. Amrich did not say he terminated Schmoeller because Schmoeller lied during the investigation or because there was not a valid complaint signed at the time of the arrest (or even because of an excessive force finding)—Amrich said he terminated Schmoeller because of his inappropriate comments to the arrestee (which were caught on video) and the arrestee's statement that he was in pain.

Dickerson told him he "didn't have anything to worry about. Nobody was after [Holford's] job, that [Holford] just had to be honest," and that others around the department thought Holford was "collateral damage." [68-9] at 47:14–48:17. None of those comments from non-decision-makers undermines Amrich's proffered reasons for terminating Schmoeller or links Schmoeller's termination to the lawsuit.[9]

Defendants' motion for summary judgment on Count II is granted.

### 3. Monell *Claims*

The parties disagree about whether Schmoeller's complaint includes a *Monell* claim against the Village or not, but it does not matter. Because the city officials did not commit an underlying constitutional violation, a *Monell* claim cannot stand against the Village. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Hart v. Mannina*, 798 F.3d 578, 596 (7th Cir. 2015).

To the extent the complaint contains *Monell* claims, the Village is entitled to judgment as a matter of law.

### B. State-Law Claim

Schmoeller's complaint contains an Illinois state-law claim for tortious interference with prospective economic advantage. Resolution of the claim would require application of Illinois law on whether an employer-entity is considered a "third party" in a tortious interference claim brought by one employee against another, which is not immediately clear. So I relinquish jurisdiction over the state-

---

[9] Schmoeller compares his termination for inappropriate comments during the arrest to the reprimand Dickerson received for allegations of problematic behavior in his personal life (that were later retracted). But the two situations are apples (misconduct during official acts) and oranges (unsubstantiated private conduct) and not a helpful comparison that raises any inference of retaliation.

law claim and dismiss it without prejudice. *See Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when 'all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.'" (citation omitted)).

## IV.  Conclusion

Perhaps all politics is local, but that does not mean that all disputes within a small town's municipal operations are politically motivated. Defendants' motion for summary judgment [68] is granted. The clerk shall enter judgment on the merits in favor of the defendants on the federal claims, and dismissing the state-law claim without prejudice. Terminate civil case.


ENTER:

_____
Manish S. Shah
United States District Judge

Date: June 18, 2018